453 P.2d 551

**BOISE DODGE, INC., an Idaho corporation,
Plaintiff, Cross-Defendant
and Appellant,**

v.

**Robert E. CLARK, Defendant, Cross-Complainant and Respondent.**

No. 10196.

Supreme Court of Idaho.

April 25, 1969.

Clemons, Skiles & Green, Boise, for appellant.

Smith, Miller & Weston, Caldwell, for respondent.

McQUADE, Justice.

Nearly all of the facts in this case are uncontroverted. In January, 1967, the management of Boise Dodge, Inc., decided to make a special effort to sell approximately thirteen 1966 cars then held in stock as "demonstrators." The only conflict in testimony came as Earl Morris, then the service manager for Boise Dodge, testified that Jack E. Day, then the general manager of Boise Dodge, ordered him to have all the odometer readings on these cars set back to zero as well as to have the cars generally cleaned up for sale. Morris said he persuaded Day to leave some miles showing on the odometers. Day denied ordering the odometer setbacks but admitted he knew they had been set back when the cars were sold. In any event, the fact that the odometer on the car purchased by respondent Clark was set back roughly 7,000 miles (from 6,968 to 165) was stipulated by Boise Dodge and shown by an internal repair order of Boise Dodge and by the testimony of an employee of Superior Auto Products who did the work on these "demonstrators" for Boise Dodge. Mr. Day is now a car salesman at Anderson Buick, and Morris, apparently fired by Day, has now been rehired by Boise Dodge as its service manager.

With these "demonstrators" on the lot, respondent Clark appeared at Boise Dodge on February 2, 1967, looking for a used Chrysler. However, as Boise Dodge had no Chryslers, Clark and his wife decided to purchase one of the 1966 "demonstrators," a Dodge Monaco, described by the two salesmen (now apparently unavailable) as a "new" car. Mrs. Clark asked how the car could be "new" with 165 miles on it, and this was explained as the result of normal driving around the premises.

After seeing the car before lunch, the Clarks returned after lunch and purchased the car. The "Automobile Agreement" signed by Mr. Clark clearly indicates on its face at its top in normal size print that the car was a "demonstrator" in that the word "Demo" is written in ink under the heading "Used" which appears next to an empty blank headed by "New." Mr. Clark admits he got a copy of this agreement, but says he focused his attention only on the figures appearing on it. Clark that day (February 2nd) gave his check for $500 and the next day (February 3rd) gave his check for $1,562 when the car was delivered to his farm. These checks plus his 1963 Pontiac traded to Boise Dodge at a value of $1,100 constituted the sales price of the car. Because Clark then discovered facts which led him to believe the car was used, he stopped payment on his two checks on the next Monday, (February 5th). The checks have not been paid, and while Clark holds the Dodge Monaco, Boise Dodge still has Clark's Pontiac.

Boise Dodge brought suit on the checks, and Clark counterclaimed for equitable rescission or for damages for breach of con-

tract and deceit as well as for wrongful attachment of his bank account and punitive damages. The district court granted appellant's motion for involuntary dismissal of the counterclaim for wrongful attachment. Also, because of the following facts, the court ruled as a matter of law that Clark had waived, or elected against, his right to rescind the contract and instead had acted to affirm it. Clark admitted on cross-examination that on February 3rd he went back to Boise Dodge to get assurance in writing that the car had never been titled to anyone else before him. On that same day, it was also explained to Clark that the window sticker on the car had been removed because that was done on all "demonstrators." On February 9th, Clark returned to Boise Dodge and had title to the new car put in his name. Clark admitted that at no time during these visits did he tell Boise Dodge he did not want the car, that he wanted his old car back, that he was dissatisfied with the deal or that he had stopped payment on the checks. Apparently Clark was not sure he wanted his old car back at all.

The court thus instructed the jury that it might find a breach of contract (damages for which would equal the car's value as represented less its actual value) or deceit (damages for which would equal the price paid for the car less its actual value). The court gave the usual instructions on misrepresentation. The court further instructed the jury that it could award punitive damages if it found appellant's actions to have been willful, wanton, gross or outrageous in order to punish and deter such conduct. The court instructed that the punitive damages must bear a reasonable

relation to any actual damages found. The jury found for appellant Boise Dodge in the amount of $2,062 (the amount owing on the contract) and for respondent Clark on his counterclaim for breach of contract damages in the amount of $350 (the value of the car as represented, $2,400, less its actual value, $2,050,[1] which values and the difference between them were testified to by an expert witness using the N. A. D. A. Bluebook for a guide). The jury also awarded punitive damages to Clark in the amount of $12,500. The court gave judgment accordingly as well as for respondent's "costs and disbursements."

Appellant Boise Dodge, Inc., makes several assignments of error which in essence present but a single ultimate issue: whether or not the award of punitive damages was proper. Involved in this question are several subsidiary issues with which we shall deal in order.

First, Boise Dodge argues that the issue of punitive damages should not have been submitted to the jury at all inasmuch as a corporation cannot be held liable for punitive damages based upon the acts of its agents unless the corporation participated in the wrongdoing or previously or subsequently ratified it. We recognize that Idaho is one of those states which applies the rule that a principal is liable for punitive damages based upon the acts of his agents only in which the principal participated or which he authorized or ratified.[2] Of course, a wooden application of this rule, which we reject, would effectively insulate all corporations from punitive damage liability, for a corporation can act only through its agents.[3] On the other hand, it is wise policy from the standpoint of proper

---

1. We note that, at page 74 of the transcript, counsel for respondent Clark led its witness as to the value of the car into inadvertent mathematical error in that the value of the car as represented ($2,400) less the adjustment for approximately 7,000 miles at five cents per mile ($350) equals $2,050, not $2,150.

2. Curtis v. Siebrand Bros. Circus & Carnival Co., 68 Idaho 285 at 305, 194 P.2d 281 at 293 (1948); in this respect Idaho

is in accord with jurisdictions which apply the "narrower" rule: see Note, The Assessment of Punitive Damages Against an Entrepreneur for the Malicious Torts of His Employees, 70 Yale L.J. 1296 at 1300, n. 35 (1961); a broader rule of liability is not without support: see Fletcher, Cyc. Corps. § 4906 (Perm. ed. 1961).

3. Fletcher, Op. cit. n. 2, *supra*, § 4906.

906

corporate responsibility to recognize that, when corporate officials and managing and policy-making agents engage in fraudulent activity in furtherance of corporate profits which inure to the benefit of shareholders, the acts of such agents must be attributed to the corporation:

> "[T]here may be good reason to use whatever devices are available to deter owners and managing officers from tolerating misconduct by employees. If exemplary damages will encourage employers to exercise closer control over their servants, there is sufficient ground for awarding them." [4]

It is on this basis that corporate liability for punitive damages has received appropriate judicial sanction, particularly in actions against car dealerships for fraud.[5]

[3, 4] We have no difficulty in applying this principle to the case at bar. The then general manager of Boise Dodge, Inc., admitted that, when the car in this case was sold to respondent Clark, he knew the odometer had been set back nearly 7,000 miles. When the management of Boise Dodge, Inc., allowed this sale to occur with full knowledge of the deception which was inherent in the situation, the corporation effectively ratified the wrongdoing. Indeed, this would even constitute corporate participation in the wrong. Further along the lines of participation, the service man-

ager of Boise Dodge, Inc., testified that it was the corporate general manager who ordered that the odometers be set back. We cannot but conclude, in view of the respective employment history of these officers, that the jury believed this testimony rather than the general manager's denial. Thus, under the Idaho rule and all the authorities cited, the court below properly allowed the jury to award punitive damages against Boise Dodge, Inc., *qua* corporation.

■ Boise Dodge, Inc., next argues that the court below erred in giving to the jury Instruction No. 17, which was as follows:

> "If you find that the cross-defendant, Boise Dodge, Inc., was guilty of wilful or wanton conduct, which proximately caused damage to the cross-complainant, Robert Clark, and that such action was gross and outrageous, and if you believe that justice and the public good require it, you may, in addition to any damages to which you find the cross-complainant, Robert Clark, entitled, award him an amount which will serve to punish the cross-defendant, Boise Dodge, Inc., and to deter others from the commission of like offenses.

> "You may not award punitive damages to the cross-complainant, however, unless you first find that he is entitled to re-

4. Note, Exemplary Damages in the Law of Torts, 70 Harv.L.Rev. 517 at 526 (1957); accord, Punitive Damages Against an Entrepreneur, n. 2, supra, at 1306–1310, which note otherwise takes a dim view of such liability.

5. Williams v. Miller Pontiac Company, 409 S.W.2d 275 (Mo.App.1966) (odometer on used car turned back 3,000 miles and car sold as new); Clancy v. Reid-Ward Motor Co., 237 Mo.App. 1000, 170 S.W.2d 161 (1943) (odometer on car turned back 30,000 miles); Jones v. West Side Buick Auto Co., 231 Mo.App. 187, 93 S.W.2d 1083 (1936) (odometer on car turned back 28,000 miles); Lewis v. Worldwide Imports, Inc., 238 Or. 580, 395 P.2d 922 (1964) (previously wrecked used car sold as "demonstrator"), noted with approval in Hodel, The Doctrine of Exemplary

Damages in Oregon, 44 Ore.L.Rev. 175 at 216 (1965); Craig v. Spitzer Motors of Columbus, Inc., 109 Ohio App. 376, 160 N.E.2d 537 (1959) (1957 Dodge used to pull a trailer to Florida sold as "demonstrator" with 51 miles on it), noted with approval in 29 U.Cinn.L.Rev. 140 (1960); District Motor Co. v. Rodill, 88 A.2d 489 (D.C.Mun.App.1952); Lufty v. R. D. Roper & Sons Motor Co., 57 Ariz. 495, 115 P.2d 161 (1941) (1936 Cord sold as 1937 Cord); Morriss-Buick Co. v. Huss, 84 S.W.2d 264 (Tex.Civ.App.1935) (custom of selling used cars as new cars); Northside Chevrolet Co. v. Beekman, 80 S.W.2d 1071 (Tex.Civ.App.1935) (used car sold as new car); J. Truett Payne Company, Inc. v. Jackson, 281 Ala. 426, 203 So.2d 443 (1967) (used demonstrator sold as new car: award of $20,000 inclusive of punitive damages affirmed).

cover actual or compensatory damages." (Tr. 103).

We find no merit in this contention, for the instruction correctly stated the law of this State respecting the basis of an award of punitive damages[6] on these facts.

■ Boise Dodge, Inc., next argues that the court below erred in refusing to set aside the jury's verdict awarding $12,500 punitive damages as excessive and because it was based upon passion and prejudice. Appellant fails, however, to support this contention with any specific reference to concrete matters which would indicate that the verdict was based upon passion and prejudice rather than upon reason. Nearly the entire record in this case stands uncontradicted, and if the facts proved at trial with respect to appellant's business conduct toward the public tended to arouse legitimate concern in the jury, we fail to see how this constitutes prejudice. In this respect, appellant's contention is vague and conclusory.

■ Appellant complains mainly about the amount of punitive damages awarded. The court gave its Instruction No. 18 as follows:

"There is no fixed or mathematical proportion, ratio, or relation between amount of actual damages and amount of exemplary or punitive damages, which in a proper case may be awarded, but such an award must not be so disproportionate to actual damages sustained as to be result of passion or prejudice rather than reason, and such an award must bear some reasonable relation or proportion to actual damages, and exemplary damages must bear some relation to damages complained of and cause thereof." (Tr. 104).

This instruction also correctly stated the law relevant to the determination of an amount of punitive damages in an action at law.[7] The question thus becomes whether the jury can be said as a matter of law to have exceeded the bounds of its discretion in making the award of damages.

■ We note preliminarily that, under the instructions of the court on the measure of actual damages sustained by respondent Clark, the jury apparently applied the standard for breach of contract rather than that for the tort of deceit. We do not view that course of action by the jury as indicating a negation of the elements of misrepresentation, fraud or deceit present in the case. In any event, from the legal point of view of the imposition of punitive damages in this case, it does not matter whether respondent's counterclaim technically sounded in contract or tort. The rule established in Idaho is that punitive damages may be assessed in contract actions where there is fraud, malice, oppression or other sufficient reason for doing so.[8] This rule recognizes that in certain cases elements of tort, for which punitive damages have always been recoverable upon a showing of malice, may be inextricably mixed with elements of contract, in which punitive damages generally are not recoverable. In such cases, punitive damages are allowed according to the substance of a showing of willful fraud.[9]

---

6. Driesbach v. Lynch, 74 Idaho 225 at 232–233, 259 P.2d 1039 at 1043 (1953); Williams v. Bone, 74 Idaho 185 at 189–190, 259 P.2d 810 at 812 (1953); Harrington v. Hadden, 69 Idaho 22 at 24–25, 202 P.2d 236 at 237 (1949); Gunnell v. Largilliere Company, Bankers, 46 Idaho 551 at 559–560, 269 P. 412 at 415 (1928); Unfried v. Libert, 20 Idaho 708 at 728–729, 119 P. 885 at 891 (1911).

7. See cases n. 5, *supra*.

8. Graves v. Cupic, 75 Idaho 451 at 458–459, 272 P.2d 1020 at 1025 (1954); *accord*, Whitehead v. Allen, 63 N.M. 63, 313 P.2d 335 (1957).

9. Ward v. Taggart, 51 Cal.2d 736, 336 P.2d 534 (1959) per Traynor, J.; Craig, n. 4, *supra*; Saberton v. Greenwald, 146 Ohio St. 414, 66 N.E.2d 224, 165 A.L.R. 599 (1946) (reconditioned watch sold by jeweler as new watch); Note, Punitive Damages In An Action For Breach of Warranty Accompanied by Fraud, 29 U. Cinn.L.Rev. 140 at 143 (1960); Note,

 The assessment of punitive damages, like the assessment of all damages, is in the first instance for the discretion of the jury.[10] Though the existence of punitive damages has been denounced as anomalous in the law, "[d]espite such denunciations the great majority of states retain the doctrine of exemplary damages in full force."[11] The criticism that punitive damages are superfluous in view of the criminal law fallaciously assumes a complete identity of criminal and civil punishment.[12] The existence of such a remedy serves useful, if limited, functions in the law as a means of punishing conduct which consciously disregards the rights of others and as a means of deterring tortious conduct generally.[13]

 Various jurisdictions, including Idaho, have limited the discretion of juries in imposing punitive damages by declaring that the amount of punitive damages must bear a "reasonable relation" to the amount of actual damages.[14] It is never made clear precisely upon what basis an amount of punitive damages will be declared "reasonable" or "unreasonable" in relation to the amount of actual damages, especially in view of the often-repeated statement that no strict mathematical ratio is to be applied. Of course, the ratios of punitive to actual damages which may be gleaned from the cases have little precedential value when excised from their respective factual settings. This is true because the culpability of a defendant's conduct and the sociological significance of damages as a deterrent vary from case to case. Thus, the true basis for an award of one amount of punitive damages as opposed to another amount lies in an overall appraisal of the circumstances of the case.

 The amount of actual damages sustained by a plaintiff is one indication of the culpability of the defendant's acts, but it cannot be the sole criterion for the assessment of punitive damages. Also relevant is the prospective deterrent effect of such an award upon persons situated similarly to the defendant, the motives actuating the defendant's conduct, the degree of calculation involved in the defendant's conduct, and the extent of the defendant's disregard of the rights of others. These are legitimate concerns of the law, and the application of any fixed arithmetic ratio to all cases in which punitive damages are assessed would be arbitrary. It therefore must be recognized that the requirement of a "reasonable relation" between actual and punitive damages serves as a rough device available to trial and appellate courts for

Exemplary Damages in Quasi Contract When Defendant is Guilty of Fraud, 13 Vand.L.Rev. 390 at 393–394 (1959).

10. Syester v. Banta, 257 Iowa 613, 133 N.W.2d 666 at 675–676 (1965) (studio dance lessons sold to 68-year-old widow; $14,300 actual and $40,000 punitive damages affirmed) ; Claude v. Weaver Construction Company, Iowa, 158 N.W.2d 139 at 145 (1968) (nuisance) ; Ostertag v. LaMont, 9 Utah 2d 130, 339 P.2d 1022 at 1024 (1959) (battery) ; Malco, Inc. v. Midwest Aluminum Sales, Inc., 14 Wis.2d 57, 109 N.W.2d 516 at 521–522 (1961) (trade libel) ; Alper v. Western Motels, Inc., Nev., 443 P.2d 557 at 559–560 (1968) (trespass) ; Worrie v. Boze, 198 Va. 533, 95 S.E.2d 192 at 201, 63 A.L.R.2d 1315 (1956) (interference with contract).

11. Note, Exemplary Damages in the Law of Torts, n. 4, supra, at 518.

12. See Note, Criminal Safeguards and the Punitive Damages Defendant, 34 U.Chi.L. Rev. 408 at 410–412 (1967).

13. Davis v. Georgia-Pacific Corporation, Or., 445 P.2d 481 (1968) (trespass) ; Templeton Feed and Grain v. Ralston Purina Co., 69 Cal.2d ——, 72 Cal.Rptr. 344, 446 P.2d 152 at 157 (1968) ; Kink v. Combs, 28 Wis.2d 65, 135 N.W.2d 789 at 797–798 (1965) (assault), noted in Walther & Plein, Punitive Damages: A Critical Analysis: Kink v. Combs, 49 Marq.L.Rev. 369 (1965).

14. See cases, n. 6 and n. 8, supra; this rule is not applied by all states, however: Oregon has no such rule, Hodel, n. 5, supra, at 232, while Colorado requires that these damages bear a simple one-to-one ratio, criticized as inconsistent with the purposes of punitive damages in Comment, Exemplary Damages in Colorado: Punitive or Puny? 35 U.Colo.L.Rev. 394 (1963).

the purpose of paring down plainly extreme awards of punitive damages.[15]

■ Applying these principles to the case at bar, we are satisfied that the jury's award of $12,500 punitive damages against Boise Dodge, Inc., was justified, and court below did not commit error in refusing to set aside that verdict. This is a case of calculated commercial fraud in broad disregard of the rights not only of respondent Clark but the consuming public generally. It occurs in an area of sales in which consumers are unable to gain accurate information about the product. On this basis we find particularly appropriate the reasoning used in the case of Walker v. Sheldon [16] in which the New York Court of Appeals determined that punitive damages would be allowed in fraud and deceit actions. That case involved the fraudulent commercial activities of Comet Press which were characterized as a " 'virtually larcenous scheme to trap generally the unwary.' " [17] That court, in a thoughtful opinion by Judge Fuld, stated:

"Exemplary damages are more likely to serve their desired purpose of deterring similar conduct in a fraud case, such as that before us, than in any other area of tort. One who acts out of anger or hate, for instance, in committing assault or libel, is not likely to be deterred by the fear of punitive damages. On the other hand, those who deliberately and cooly engage in a far-flung fraudulent scheme, systematically conducted for profit, are very much more likely to pause and consider the consequences if they have to pay more than the actual loss suffered by an individual plaintiff. An occasional award of compensatory damages against such parties would have little deterrent effect. A judgment simply for compensatory damages would require the offender to do no more than return the money which he had taken from the plaintiff. In the calculation of his expected profits, the wrongdoer is likely to allow for a certain amount of money which will have to be returned to those victims who object too vigorously, and he will be perfectly content to bear the additional cost of litigation as the price for continuing his illicit business. It stands to reason that the chances of deterring him are materially increased by subjecting him to the payment of punitive damages." [18]

Those considerations are fully applicable to the case at bar.

■ Finally, appellant argues that certain other instructions to the jury created confusion or prejudice. Again, however, this contention is unsupported by any specific references to concrete matters which could be said with any certainty to have created prejudice. Appellant in effect asks that we presume prejudice from the amount of damages awarded against it, but we have already found valid grounds for the jury's verdict sufficient to preclude such a presumption.

■ Appellant would have us assign prejudice to the court's first statement to the jury which summarized the allegations and claims of the parties as shown by the pleadings. Though this review was somewhat lengthy, we do not view it as unnecessarily confusing, for the case as a whole was simple in its essentials and supported by an uncontradicted set of facts. Nor was this summary prejudicial in view

15. Sheward v. Magit, 106 Cal.App.2d 163, 234 P.2d 708 at 710–711 (1951) (battery) ; Garland Coal & Mining Co. v. Few, 267 F.2d 785 at 790 (10th Cir. 1959) (Oklahoma law applied to nuisance) ; Finney v. Lockhart, 35 Cal.2d 161, 217 P.2d 19 at 21 (1950) (trade libel) ; Powers v. Taylor, 14 Utah 2d 152, 379 P.2d 380 at 382–383 (1963) (trespass).

16. 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961).

17. *Id.* 223 N.Y.S.2d at 490, 179 N.E.2d at 498.

18. *Id.* 223 N.Y.S.2d at 492, 179 N.E.2d at 499.

**910**

of the first paragraph of the court's first formal instruction:

"The foregoing recital is merely a summary of what the parties allege in their pleadings filed prior to the commencement of this trial, and are not set forth here as any statement by the Court of what the facts are, except inasmuch as the allegations are admitted by the opposing parties. The Court does not express to the jury any opinion upon the facts of this case." (Tr. p. 95).

Appellant's reliance upon I.C. § 10–211 in this respect is misplaced in that it does not appear that any "papers [were taken] to [the] jury room" in this case.[19] Moreover, the trial judge has a duty to outline to the jury the issues presented by the pleadings of all parties as shown by their allegations, denials and admissions.[20]

■ Appellant also contends that Instruction No. 16 created prejudice:

"You are instructed that the statutes of the United States require that there be securely affixed to the window of every new automobile a label on which the manufacturer of said automobile clearly endorses all the information set forth in Public Law 85–506 and the same must remain attached thereto until the actual custody and possession of said automobile is delivered to the ultimate purchaser. Ultimate purchaser means with respect to any new automobile the first person other than a dealer purchasing in his capacity as a dealer who in good faith purchases such new automobile for purposes other than resale." (Tr. 103).

This instruction was not entirely irrelevant to the issues of fraud and deceit which were fairly presented to the jury, for the absence of a window sticker on the car tended to show the overall inability of consumers to acquire specific information about the product put up for sale. Boise Dodge, Inc. exploited this type of inequality of information. From another standpoint, the absence of a window sticker might have weighed in appellant's favor in that it was another factor showing that the car was not a "new" car as respondent at first erroneously believed.

■ We fail to see that this instruction created any prejudice, since appellant failed to object to the admission of evidence concerning the absence of a window sticker. Indeed, appellant's own counsel, apparently upon the above-mentioned theory favorable to it, on cross-examination again revealed the fact that the window sticker had been removed:

"Q. They told you it was a demonstrator, didn't they?

"A. After I asked him where the window sticker was, the federal window sticker.

"Q. So, at that time you knew it was a demonstrator?

"A. Then, yes." (Tr. 57).

Appellant made no effort to impeach respondent's prior statements made upon direct examination.

"Q. Was there anything else said at that time [when Clark visited Boise Dodge, Inc.]?

"A. I asked him [Kelley] where the federal window sticker was.

"Q. What was said about that?

"A. He said they had taken them off, he said, 'We take them off all our demonstrators,' and he said that was a demonstrator and that was the first it was ever mentioned that it was a demonstrator.

"Q. Did you ever see the window sticker that is supposed to be on new cars on that car?

"A. I didn't." (Tr. 46).

19. The cases of Pearson v. City of Weiser, 69 Idaho 253, 206 P.2d 264 (1949), Continental Jewelry Co. v. Ingelstrom, 43 Idaho 337, 352 P. 186 (1926), and Walton v. Mays, 33 Idaho 339, 194 P. 354 (1920) are not pertinent for the same reason; indeed, in those cases no error was found in actually allowing the pleadings to go to the jury room.

20. Luther v. First Bank of Troy, 64 Idaho 416 at 420, 133 P.2d 717 and 719 (1943).

Appellant thus utilized for its purposes the fact that a federal window sticker was absent from the car purchased by Clark. We fail to see how it was error for the court to have instructed the jury on the same matter for purposes equally relevant to the deception practiced upon Clark, namely, the systematic concealment of material information related to the sales of cars.

The judgment of the court below is affirmed. Costs to respondent.

McFADDEN, C. J., and DONALDSON, SHEPARD and SPEAR, JJ., concur.